# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GAIL STOCKTON, individually, and as
special administrator of the ESTATE OF
MICHAEL MADDEN, deceased,

               **Plaintiffs,**

v.                               **Case No. 18-C-758**

MILWAUKEE COUNTY, a municipal
corporation, DAVID A. CLARKE, JR.,
RICHARD R. SCHMIDT, BRIAN PIASECKI,
ARMOR CORRECTIONAL HEALTH
SERVICES, INC., a foreign corporation,
and MERCY MAHAGA,

               **Defendants.**

_____

## DECISION AND ORDER

Gail Stockton, individually and in her capacity as special administrator of the Estate of Michael Madden, has filed this action pursuant to 48 U.S.C. § 1983, complaining that Madden's constitutional rights were violated in a series of incidents at the Milwaukee County Jail that culminated in Madden's death. The complaint also alleges various violations of state law related to Madden's death.[1] Among the

_____

[1] Armor argues that plaintiffs' respondeat superior claim against it must be dismissed because Armor is only responsible for its own policies under § 1983, not the misconduct of its workers. However, the complaint alleges respondeat superior liability against Armor only with respect to state law negligence, not § 1983. (ECF No. 1, ¶ 115). The Plaintiffs agree that Armor does not bear vicarious liability under § 1983. (ECF No. 24, ¶ 1, n. 1). Plaintiffs may proceed on their respondeat superior claims as alleged.

defendants are former Milwaukee County Sheriff David Clarke, former senior Jail official Richard Schmidt, and Armor Correctional Health Services ("Armor"), a private corporation that provides healthcare services to inmates at the Jail. These defendants have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss various of plaintiff's claims.

## I.    BACKGROUND

Stockton asserts claims against Armor under *Monell v. Department of Social Services,* 536 U.S. 658 (1978), and against Clarke and Schmidt in their individual capacities. The following facts are drawn from the complaint and, for purposes of these motions, accepted as true with all inferences drawn in plaintiff's favor. *See, e.g., Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2015).

On January 1, 2016, Armor renewed a contract with Milwaukee County that gave Armor the exclusive right to provide medical services and coordinate care through local hospitals for detainees and inmates at the jail for a period of one year. *Id.*, ¶ 18. Under the contract, Armor agreed to cover all costs, up to a limit, for detainees who required outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies. *Id.,* ¶ 20. Armor also covered all costs for diagnostic testing. *Id.*, ¶ 21. Under the contract, Armor retained authority to determine whether

2

detainees should receive diagnostic testing or be sent for outside medical treatment, including hospitalization and specialized treatment for serious illnesses and emergencies. *Id.*, ¶ 22. Any expenditure of funds for such services reduced Armor's profit. *Id.,* ¶ 23.

On September 29, 2016, Michael Madden was arrested by the Franklin Police Department for possessing heroin and obstructing justice during a traffic stop. ECF No. 1, ¶ 32. At the time, he appeared to be coming down from heroin and was experiencing withdrawal. *Id.* He was transported to the Milwaukee County Mental Health Complex and then to the County Jail. *Id.*, ¶ 34. During intake screening at the Health Complex and Jail, Madden reported that he was addicted to heroin and had most recently injected heroin that morning. *Id.* Needle tracks were visible on his arms and hands, such that it was apparent he had taken drugs that day. *Id.*, ¶ 35. Madden also reported to nursing staff that he had a congenital heart defect, which was documented in his chart. *Id.*, ¶ 36.

Based on his history of intravenous drug use and congenital heart defect, Madden was at very high risk for infective endocarditis. *Id.*, ¶ 37. Infective endocarditis is a serious medical condition involving the growth of bacteria on the heart valves. *Id.*, ¶ 24. Common signs of infective endocarditis include fever, a new or changed heart murmur, flu-like symptoms, fatigue or weakness, rapid heart rate, weight loss and chest pain. *Id.*, ¶ 27. When timely diagnosed, infective endocarditis may be treated with antibiotics and possibly surgery; persons who receive such treatment can be expected to make a full recovery. *Id.,* ¶¶ 29-30. Untreated, the condition will ultimately cause organ failure and death. *Id.*, ¶ 31.

3

Between October 8 and 14, 2016, Madden began to exhibit classic signs and symptoms of infective endocarditis. These included an abnormally high heart rate, low blood pressure, rapid loss of weight, chest pain, and weakness so severe that he could not walk and needed to be transported by wheelchair. *Id.*, ¶¶ 40-44. On October 14, Nurse Practitioner Mercy Mahaga, an Armor employee, evaluated Madden on a sick call and found that he had a heart murmur that had not been present nine days earlier. *Id.*, ¶ 43.

Between October 14 and 25, there is virtually no nursing documentation about Madden's medical condition in his chart. *Id.*, ¶ 46. Neither Mahaga nor any other staff member followed up or monitored Madden's symptoms. *Id.* On October 25, Madden submitted a written request to be seen by medical staff, on which he reported that he was experiencing "bad symptoms" for what he believed was severe allergies. *Id.*, ¶ 47. He was not evaluated following the request and did not receive any additional attention from healthcare staff until he fell terminally ill on October 28. *Id.*, ¶ 48. At no point before he fell terminally ill was a plan entered to monitor his symptoms. *Id.*, ¶ 49. No diagnostic testing was performed; no medical doctor was consulted about Madden's condition or symptoms; and Mr. Madden was not transferred to an outside provider for specialized medical evaluation or services. *Id.*

Around 1:23 a.m. on October 28, nursing staff responded to Madden's calls for help. *Id.*, ¶ 50. Recognizing that he was in a state of medical emergency, they removed him from his cell and placed him in a chair in a common area. *Id.* Madden stated his chest hurt and he couldn't breathe. *Id.*, ¶ 51. He soon began hyperventilating and became restless and confused. *Id.*, ¶ 52. Eventually he fell to the floor and began to

4

vomit. *Id.*, ¶¶ 54-55. Nursing staff decided he needed to be transferred to the facility's medical clinic for evaluation. *Id.,* ¶ 55. At first, the correctional staff tried to force Madden to walk to the clinic. *Id.* He could not walk and the staff repeatedly dropped him, so that he struck his head against the wall and floor. *Id.*, ¶¶ 55-58. Finally, the staff transported Madden by wheelchair. *Id.,* ¶ 59. When he arrived in the clinic he was not breathing; he was pronounced dead at 2:23 a.m. *Id.* An autopsy report concluded that the cause of Madden's death was infective endocarditis with myocarditis. *Id.*, ¶ 60.

Plaintiff alleges that the jail staff's inadequate response to Madden's need for medical care fits into a larger pattern of jail and Armor employees ignoring requests from detainees with clear symptoms of serious medical conditions and delaying the provision of medical treatment. In support of this allegation, the complaint references a series of reports about medical care at the jail, dating from 2001 to the time of Madden's death, produced by the jail's appointed medical monitor, Dr. Robert Shansky. *Id.*, ¶¶ 63-65. According to the complaint, Shansky's reports repeatedly documented inadequate medical and correctional staffing at the jail, and "explained that as a result of inadequate staffing and inadequate monitoring of detainee medical needs, detainees were not receiving the care they needed and suffered from critical delays in care." *Id.*, ¶ 66. The reports also explained that "correctional officers and others would choose to ignore symptoms reported by detainees." *Id.*, ¶ 67.

The complaint also describes three other fatalities at the jail, all in 2016, that allegedly resulted from an inadequate response to a detainee's serious need for medical care:

5

¶ 72. Indeed in April 2016, Terrill Thomas was detained at the County Jail and suffering from bipolar disorder. Correctional officers shut off water to Mr. Thomas' cell, neither correctional officers nor nursing staff responded to Mr. Thomas' clearly deteriorating condition for seven days, and Mr. Thomas ultimately died of profound dehydration.

¶ 73. In July 2016, Shade Swayzer was detained at the County jail when she was nearly nine months pregnant. Ms. Swayzer went into labor in her cell, her calls for help went ignored, and she did not receive medical care that was urgently needed. Her daughter, Laliah, did not survive the ordeal and died shortly after her birth.

¶ 74. In August 2016, just one month before Mr. Madden was detained, Kristina Fiebrink was detained on August 24 at the County Jail after having recently used heroin. She displayed clear signs of being under the influence, but was not closely monitored and was not assessed by a medical practitioner. On the night of August 27, Ms. Fiebrink began screaming, begging and pleading for help in her cell. Though she was in desperate need of medical attention, staff members ignored her pleas. She died in her cell the next morning.

*Id.*, ¶¶ 72-74.

Relying on the Shansky reports and the 2016 deaths, the complaint alleges that

there existed a widespread practice at the county jail under which staff, including correctional officers and medical personnel, commonly failed or refused to:

   a. properly examine a detainee with a serious medical condition or emergency;
   b. provide proper medication to a detainee with a serious medical condition or emergency;
   c. respond to detainees who requested medical attention, medication, or to see a doctor;
   d. respond to detainees who exhibited obvious signs of serious medical illness; and
   e. adequately staff the jail with the correctional and medical personnel necessary to respond to detainee needs.

6

*Id.*, ¶ 80. Armor "had notice of the policies and widespread practices pursuant to which detainees like Mr. Madden were routinely denied medical care and evaluation" and further had notice that requests for medical care from detainees with clear symptoms of serious medical needs were routinely delayed or completely ignored. *Id.*, ¶ 82. This conduct "was allowed to flourish because Armor directly encouraged the type of misconduct at issue in this case." *Id.*, ¶ 83. Plaintiff also alleges that Armor acted with deliberate indifference in failing to develop policies, train and supervise medical personnel, discipline prior instances of misconduct, and adequately staff the jail to ensure that detainees at the jail would receive appropriate care and monitoring for serious medical conditions. *Id.,* ¶¶ 84-86.

The complaint also alleges that *Milwaukee County* acted with deliberate indifference by operating under a contractual relationship with the Armor that created a "powerful financial disincentive for Armor medical staff to conduct diagnostic testing for a seriously ill inmate and/or send a seriously ill inmate to an outside facility for medical services." ¶ 87. The complaint does not, however, appear to allege that participation in this contractual arrangement amounts to deliberate indifference on *Armor's* part.

As for Clark and Schmidt, the complaint alleges that by September 2016, they were on notice of a widespread practice at the jail of ignoring series medical needs of detainees, and that they were also on notice that requests from detainees with clear symptoms of serious medical needs were routinely delayed or ignored. *Id.*, ¶ 79. The complaint alleges that Clark and Schmidt encouraged this conduct by failing to train, supervise, and control correctional officers and personnel, and by failing to adequately discipline prior incidences of similar misconduct. *Id.¸* ¶ 81.

7

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

## III.    DISCUSSION

### a.  *Monell* Claim against Armor

For purposes of § 1983, a private corporation like Armor acting under color of state law is treated as a municipal entity. *Jackson v. Ill. Medi-Car, Inc.* 300 F.3d 760, 766 n.6 (7th Cir. 2002). To state a *Monell* claim for municipal liability, a plaintiff must allege that the entity is shown to have maintained a custom, policy or practice that contributed directly to the infliction of the constitutional injury. *Palmer v. Marion County,* 327 Fed.3d 588, 594 (7th Cir. 2003). "There must be an affirmative link between the policy and the particular constitutional violation alleged." *Id.* Unconstitutional policies or customs can take three forms: (1) An express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute

a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. *Id.* at 594-95. To successfully plead the "widespread practice" species of *Monell* claim, a plaintiff "must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, or a 'series of violations to lay the premise of deliberate indifference." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir., 2010).

The complaint alleges several "failures" on the part of Armor, but I think the complaint is best construed as alleging that Armor maintained an affirmative, implicit policy of ignoring the serious medical needs of detainees—a policy of inaction, as it were. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) ("[I]t is more confusing than useful to distinguish between claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy. . . . Both in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event."). The three other fatalities cited in the complaint are sufficient facts to ground an allegation that Armor's treatment of Madden was not random. And the allegations regarding Armor's contractual relationship with the county strongly support the inference that Armor acted to promote its financial best interests by implicitly encouraging employees to avoid or delay referring detainees to outside providers for diagnostic testing or emergency treatment. The allegation that Armor persistently understaffed the jail also supports the allegation of an affirmative implicit policy on Armor's part, rather than random failures to act by employees. An

9

individual employee's failure to respond adequately to a detainee's medical needs is a "highly predictable consequence" of persistent understaffing, which is another way of establishing Armor's potential liability. *See Arrington v. City of Chicago*, 2018 WL 620036 (N.D. Ill., January 20, 2018), *citing White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016).

Armor argues that the allegations are too broad and all-encompassing to put Armor on notice of the alleged wrongful custom or practice. But the allegations in the complaint are quite clear: Madden was in obvious, rapid decline—with an elevated heart rate, low blood pressure, rapid weight loss, chest pain, and a new heart murmur—and Armor's employees did not take the minimal steps of monitoring his condition, or seeking a diagnosis so as to provide proper treatment. If the allegations are broad, it is because the scope of the alleged inaction was broad; the complaint is not so short on facts that Armor can be said to lack notice of its alleged unconstitutional conduct.

Next, Armor argues that the other fatalities cited in the complaint are too dissimilar from the circumstances that culminated in Mr. Madden's death to permit the reasonable inference that the conduct that gave rise to the injury was so widespread as to constitute a government practice or custom. It is true that the medical conditions in the incidents are different, but the essential contours of the scenario are the same: a person in the jail's custody presented an obvious need for medical monitoring and treatment, and Armor staff did not provide that minimal level of care. The complaint isn't alleging a gap-in-policy sort of *Monell* claim, which might require a more closely analogous series of incidents in order to support the inference that the policymaker was on notice of a need for policy in a certain specific area (e.g., a policy for management of

10

detainees in withdrawal from heroin, or a policy for management of detainees in labor). Again, the complaint alleges that Armor had an affirmative, implicit policy of ignoring the serious medical needs of detainees, and four fatalities described in the complaint (Madden's and the other three) share the common features necessary to support that allegation.

Finally, Armor argues that plaintiffs have not sufficiently pled that the alleged policy was the "moving force" behind Madden's injury. This argument fails: the complaint alleges that Armor's implicit policy was for its employees to ignore inmates' serious medical needs, it alleges that Armor employees ignored Madden's serious medical need, and it alleges that, in consequence, Madden's condition worsened and he died. The causal link is direct. Plaintiff may proceed on her *Monell* claim against Armor.

### b. Individual Capacity Claims Against Clarke and Schmidt

Sheriff Clarke and Inspector Schmidt move to dismiss the individual capacity claims against them on grounds that the complaint does not allege that either of them had any direct personal involvement in the events leading to Madden's death. However, the Seventh Circuit has held that

> [i]f a senior jail or prison official, including a person with final policymaking power, is aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety, his failure to enforce the policy could violate the Eighth Amendment. Similarly, if a supervisor designed or is aware of the institution's deliberately indifferent policy that caused a constitutional injury, then individual liability might flow from that act."

*Daniel v. Cook County*, 833 F. 3d 728, 737 (2016) (internal citations omitted). The Shansky reports and the three prior deaths in 2016 substantiate the allegation that Clarke and Schmidt had personal knowledge of the deficiencies in Armor's provision of health care at the jail and did not reasonably intervene. Plaintiff may proceed with her claims against Clark and Schmidt. Because the federal claim against Sheriff Clarke remains viable, I will also continue to exercise supplemental jurisdiction over the state law claims against him.

## IV.    CONCLUSION

**IT IS ORDERED** that defendant Armor's motion to dismiss (ECF No. 15) is **DENIED.**

**IT IS FURTHER ORDERED** that Armor's motion to stay proceedings and discovery pending resolution of its motion to dismiss (ECF No. 17) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that defendants Clarke and Schmidt's motion to dismiss (ECF No. 21) is **DENIED.**


Dated at Milwaukee, Wisconsin, this 26th day of March, 2019.

_s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge

12