# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GAIL STOCKTON, Individually and as
Special Administrator of the ESTATE OF
MICHAEL MADDEN, deceased.
    Plaintiff,

    v.                                                    Case No. 18-CV-758

MILWAUKEE COUNTY, et al.,
    Defendants.

## DECISION AND ORDER

Plaintiff Gail Stockton, individually and as special administrator of the estate of Michael Madden, brings this action against defendants Milwaukee County, former Milwaukee County Sheriff David Clarke, former Milwaukee County Inspector Richard Schmidt, former Milwaukee County Jail Commander Nancy Evans, and Milwaukee County Jail ("MCJ") employees Jeffrey Andrykowski and Brian Piasecki (collectively the "Milwaukee County Defendants"), as well as Armor Correctional Health Services ("Armor") and Armor employees CaryAnne Adriano and Mercy Mahaga (collectively the "Armor Defendants"). At all relevant times, Milwaukee County hired Armor to provide healthcare services at MCJ. Plaintiff alleges the defendants violated Madden's constitutional rights to adequate healthcare and to be free from excessive force. Plaintiff also brings state law negligence, wrongful death, and invasion of privacy claims against defendants. Before me is a motion for summary judgment by the Milwaukee County Defendants and a motion for partial summary judgment by the Armor Defendants.

## I. BACKGROUND

This case concerns Michael Madden, an inmate at the MCJ who died of an undiagnosed heart infection a few weeks after he entered the jail. On September 29, 2016, Madden entered MCJ pursuant to an arrest warrant issued as the result of an outstanding probation violation. During his intake screening, Madden disclosed a history of intravenous drug use and a congenital heart defect. Madden was placed on a heroin withdrawal protocol for six days. On October 5, nurse practitioner Mercy Mahaga saw Madden in the MCJ clinic and performed a urine drug screen. Mahaga listened to Madden's heart and lungs and did not detect a heart murmur at this time. Mahaga instructed Madden to increase his fluid intake. Between October 6 and October 10, medical professionals saw Madden at least five times. On October 11, a correctional officer noted on Madden's tier card[1] that she responded to a medical emergency called because Madden reported chest pain. A registered nurse (RN) saw Madden whose heart and respiration rate were slightly elevated and blood pressure low. His vitals were within normal limits. Madden reported that he had not been drinking water and was given intravenous fluids to treat dehydration. After the treatment, Madden reported feeling better.

On October 13, a correctional officer noted on Madden's tier card that she responded to a medical emergency called because Madden had complained of "heart issues" and "trouble breathing." RN CarryAnne Adriano conducted an urgent care

---

[1] Neither party explains in detail what a tier card is, but it appears to be a card used by correctional officers to record details of their interactions with inmates. Plaintiff does not argue that tier cards were regularly, or ever, reviewed by healthcare personnel.

2

assessment outside of Madden's cell. Madden's heart rate was elevated, and he had a low-grade fever, but his vital signs were otherwise normal. His lungs sounded clear, his heart rhythm was normal, and he showed no signs of distress. Madden reported that he was experiencing diarrhea and not drinking enough water. Adriano noted that Madden's pain was "burning," "intermittent," and "mild." Adriano also noted that Madden reported a history of gastroesophageal reflux disease ("GERD"), a condition which can cause heartburn and chest pain. She stated that Madden was withdrawing from drugs and not eating or drinking appropriately which she believed accounted for his symptoms. She recommended treatment for heartburn, instructed Madden to increase his fluid intake, and scheduled a follow-up appointment with a healthcare practitioner.

On October 14, Mahaga saw Madden again. Madden complained of watery diarrhea, that he could not tolerate the jail diet, and that he couldn't sleep. Mahaga took Madden's vitals, noted that he had lost seven pounds but that he did not appear to be in acute distress and was alert and oriented to person, place, and time. She also noted that his heart rate and rhythm were regular and his heart sounds normal, but she detected a +2 (on a scale of 1 to 6) mitral valve heart murmur. She stated that she did not consider a +2 heart murmur to be a medical emergency and did not believe that it "need[ed] to be worked up." The parties agree that that a heart murmur may be caused by an infection or a lack of fluids. Mahaga noted in Madden's record: "No additional medical interventions initiated- encouraged to drink water- patient drank cup while in clinic." ECF no. 85-1 p. 2. Mahaga also reviewed Adriano's notes regarding the October 13 incident. Mahaga stated she did not understand Adriano's note indicating that Madden had complained of chest pain because Adriano did not use standard

medical notation. Mahaga did understand, however, that Madden had presented with a low-grade fever, that his heart rate was elevated when his cell was being searched, that he reported not drinking water and complained of five to eight loose stools per day. Mahaga also understood that intravenous drug users are at risk of infective endocarditis a condition which could cause a heart murmur.

On October 25, Madden complained of severe allergies and requested an antihistamine. Medical personnel did not respond to this request. On October 28, Madden complained of a medical emergency and correctional officers Brian Piasecki and Jeffrey Andrykowski and nurses Adriano and Bonnie Leigh responded. Madden complained of chest pain, difficulty breathing, and difficultly standing and walking. He informed the nurses that he had a heart condition. The correctional officers led Madden out of his cell and into a chair, and Piasecki pulled up his shirt and told him to "sit the fuck up." The nurses determined that Madden had a high heart rate and told Adrykowski that Madden should be brought to the clinic. Piasecki attempted to escort Madden to the clinic, but Madden had trouble walking and fell down. Piasecki again swore at Madden, told him to get up, and lifted him by the shirt. Correctional staff then ordered a wheelchair to transport Madden to the clinic. Piasecki walked Madden to the wall near the exit door to wait for the wheelchair. Piasecki sat Madden on the floor and stood next to him such that Madden was leaning against Piasecki's leg. Madden fell again and hit his head on the wall. Piasecki propped Madden so that Madden was again leaning against his leg. Nurse Leigh stated that Piasecki continued to curse, and that he purposefully took a step backward causing Madden to fall back and hit his head on the cement.

4

At this point, the nurses left the cell area and returned to the clinic. They stated that Andrykowski ordered them to return to the clinic which Adrykowski denies. When the wheelchair arrived, four correctional officers, including Andrykowski and Piasecki, placed Madden in the wheelchair and boarded an elevator to bring him to the clinic. While on the elevator, Piasecki checked Madden's eyes with his flashlight in an attempt to determine if Madden had suffered a head injury. The officers did not assess Madden's general responsiveness but stated that they believed that Madden was conscious and breathing. In the clinic, Adriano and Leigh discussed what to do when Madden arrived. Adriano believed that less than five minutes had elapsed since they had been with Madden, and Leigh stated it was no more than two minutes. Seconds after Madden arrived at the clinic, Adriano noticed that he was not breathing and ordered the correctional officers to place him on an examination table. Adriano instructed Piasecki to perform CPR on Madden which Piasecki did. Madden died soon after.

The parties agree that the typical presentation of infective endocarditis is a heart murmur with shortness of breath and an elevated temperature. They also agree that the last possible date on which medical intervention could have prevented Madden's death was October 27, 2016.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light

5

most favorable to the non-moving party and grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

### B. Deliberate Indifference Standard

To satisfy the Eighth Amendment's deliberate indifference standard[2] plaintiff must show that (1) Madden suffered from an objectively serious medical condition; (2) a defendant knew of the condition and was deliberately indifferent in treating it; and (3) the indifference caused Madden's injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). A condition is objectively serious if the failure to treat it "could result in further significant injury or the unnecessary and wanton infliction of pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (internal quotations omitted). The parties do not dispute that infective endocarditis is an objectively serious medical condition. Thus, the issue presented is whether the defendants were deliberately indifferent to the risk of infective endocarditis. To prevail, plaintiff must demonstrate that a defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and actually drew that inference. *Balsewicz v. Pawlyk*, 963 F.3d 650, 654–55 (7th Cir. 2020). In other words, plaintiff must establish a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This means "more than negligence or even gross negligence;" it means "that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018).

---

[2] Madden was booked into the MCJ pursuant to an arrest warrant issued as the result of a probation violation. Defendants argue the Eighth Amendment standard applies as probation is a punishment imposed in lieu of confinement following a conviction. *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). Plaintiffs do not dispute this. Thus, I will analyze the case under the Eighth Amendment standard. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

6

That a medical professional provided some care does not necessarily mean that he or she was not deliberately indifferent. *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016). "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment … ." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). "A jury can 'infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that was not actually based on a medical judgment.'" *Duckworth v. Ahmad*, 532 F.3d 685, 679 (7th Cir. 2008). In other words, plaintiff "can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal quotations omitted).

**1. Mercy Mahaga**

Plaintiff presents evidence that during her examination on October 14, facts were available to Mahaga from which she could have drawn an inference that Madden was at serious risk of infective endocarditis. Specifically, Madden's fever on October 13, his history of intravenous drug use, and his heart murmur are symptoms or risk factors of infective endocarditis from which Mahaga could have inferred a serious risk. But to succeed on a deliberate indifference claim, plaintiff must present some evidence that Mahaga *actually* drew that inference, and plaintiff has not done so. The parties agree that a heart murmur with shortness of breath and an elevated temperature are symptoms

or risk factors of infective endocarditis.[3] The parties also agree that intravenous drug users are at risk of infective endocarditis. During the October 14 exam, Mahaga was aware that Madden was an intravenous drug user and that he had a heart murmur rated at +2 on a scale of 1 to 5. During the exam, Madden did not have shortness of breath or a fever and did not complain of symptoms of infective endocarditis. Mahaga knew that Madden had a low-grade fever on October 13, but the fever had subsided without treatment. The only symptom of infective endocarditis the exam revealed was the heart murmur, and Mahaga stated that she did not believe that a +2 heart murmur was a medical emergency or required a work up. Whether or not Mahaga should have inferred a risk of infective endocarditis and ordered more tests to rule it out, it is clear that she did not infer such a risk and that, in her medical judgment, no further follow up was required.

Plaintiff points to expert Roscoe's opinion that Mahaga's failure to further investigate Madden's heart murmur by ordering blood work or an electrocardiogram "egregiously breached the applicable standard of care," and argues that this statement indicates an absence of professional judgment that amounted to deliberate indifference. But, the law is different. "By itself an expert's assessment that a treatment decision was unreasonable is not enough to establish conscious disregard of a known risk." *Zaya v. Sood*, 836 F.3d 800, 807 (7th Cir. 2016). This is so because a disagreement between two medical professionals about the proper course of treatment does not suffice to establish

---

[3] The parties disagree as to whether Mahaga was aware that Madden had chest pain or tachycardia, but plaintiff does not argue that these are symptoms or signs of infective endocarditis. Thus, the disagreement is irrelevant to the question of whether Mahaga could have inferred that Madden was at risk of endocarditis or whether she actually drew that inference.

the sufficiently culpable state of mind necessary for deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Even when an expert testifies that a course of treatment deviated from the standard of care, such testimony "highlights a difference in medical opinion over the course of treatment" suggesting "negligence rather than deliberate indifference." *Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 916–17 (7th Cir. 2020). Roscoe also opines that Mahaga breached the standard of care by failing to order additional diagnostic tests. However, "the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). "A medical decision not to order" diagnostic tests "does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court." *Estelle*, 429 U.S. at 107.

Plaintiff argues that three cases warrant a jury trial, but they are distinguishable. In *Sherrod v. Lingle*, a medical provider gave aspirin to a prisoner with appendicitis and returned him to his cell. 223 F.3d 605, 611-12 (7th Cir. 2000). The provider had noted that appendicitis needed to be ruled out indicating that the provider had actually suspected appendicitis and allowing a finding of deliberate indifference. *Id.* Plaintiff here presents no evidence that Mahaga actually suspected infective endocarditis. Similarly, in *Conley v. Birch*, a provider authorized only painkillers and ice to treat what turned out to be a fractured hand, and the plaintiff presented evidence that the provider actually suspected a fracture in the form of a note with the word "fracture" circled. 796 F.3d 742, 747 (7th Cir. 2015). Finally, in *Berry v. Peterman*, the Seventh Circuit held that a provider could be found to have acted with deliberate indifference when she offered only pain medication for tooth pain and refused plaintiff's request to see a dentist even after the

9

medication had proven ineffective. 604 F.3d 435, 441–42 (7th Cir. 2010). In the present case, there is no evidence that Mahaga persisted in a course of treatment after she knew it was ineffective.

Finally, plaintiff argues that Mahaga may have lied about whether she was aware that Madden had a recent history of chest pain and trouble breathing. Absent evidence demonstrating that a witness's testimony is false, speculation that a witness is lying cannot be used to defeat summary judgment. *Aygyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). Plaintiff contends that Madden's tier card stated he had complained of shortness of breath and that inmates were required to bring tier cards with them during clinical exams. However, Mahaga stated that she did not review Madden's tier card, and plaintiff presents no evidence indicating this statement was false. Plaintiff also argues that Mahaga may have lied when she stated she did not know that "cp" stood for "chest pain." But plaintiff does not argue that chest pain is a symptom or sign of infective endocarditis, thus it is irrelevant whether Mahaga knew that Madden suffered from chest pain.

Plaintiff fails to adduce evidence that Mahaga was actually aware of a risk of infective endocarditis and ignored that risk. Accordingly, I will grant defendants' motion for summary judgment as regards Mahaga.

10

Case 2:18-cv-00758-LA   Filed 12/30/21   Page 10 of 18   Document 108

### 2. CarryAnne Adriano

Plaintiff argues that Adriano's actions on October 28, the night Madden died, amounted to deliberate indifference.[4] Specifically, plaintiff argues that there is a factual dispute about why Adriano left the cell area and returned to the clinic. Adriano stated that she left because the correctional officers ordered her to return to the clinic; the officers stated that Adriano simply left. If the jury were to credit the officers, plaintiff contends, it could infer that Adriano abandoned Madden during a medical emergency without a reason. However, plaintiff's deliberate indifference claim requires that the deliberate indifference cause an injury. *Gayton*, 593 F.3d at 620. Plaintiff's experts opine, and defendant does not dispute, that the last opportunity for a medical intervention that could have saved Madden was on October 27. Thus, plaintiff cannot establish that Adriano's conduct on October 28 caused an injury.

Even if plaintiff could show an injury, no reasonable jury could conclude that Adriano's conduct on October 28 amounted to deliberate indifference. Adriano stated that on October 28 she or nurse Leigh took Madden's vitals and noted that his heart rate was high. She then instructed Andrykowski to bring Madden to the medical clinic for further evaluation. While the correctional officers were waiting for a wheelchair to transport Madden to the clinic, she left the cell area and went to the clinic arriving there less than five minutes before Madden. When Madden arrived, she resumed her attempts to treat him and, when he was unresponsive, ordered Piasecki to perform CPR. Even if it would

---

[4] Plaintiff alleged in her amended complaint that Adriano's actions on October 13, 2016 also constituted deliberate indifference. Defendants dispute this, and plaintiff does not respond to defendant's argument thus waiving her claim regarding Adriano's October 13 conduct. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

have been better for Adriano to accompany Madden to the clinic, no reasonable jury could infer that her conduct constituted deliberate indifference to Madden's medical needs. Rosoe's opinion that Adriano's actions deviated from the standard of care is insufficient to establish deliberate indifference. Accordingly, I will grant defendants' motion for summary judgment as regards Adriano.

### 3. Jeffrey Andrykowski

Plaintiff argues that Andrykowski was deliberately indifferent to Madden's serious medical needs because he failed to aid Madden in the elevator. But again, because the parties agree that after October 27, it was too late for medical intervention, plaintiff cannot show that Andrykowski's conduct caused an injury. Even if plaintiff could establish cause, no reasonable jury could find that Andrykowski's actions rose to the level of deliberate indifference. Generally, nonmedical personnel are entitled to defer to the judgment of jail health professionals. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The nurses who responded to the medical emergency instructed Andrykowski to bring Madden to the clinic, which he did. He did not render additional aid on the elevator, but he was not instructed to by the nurses and he knew that Madden would receive aid once he reached the clinic. At most, Madden was away from medical personnel for five minutes. Plaintiff argues that while on the elevator Andrykowski should have initiated CPR, but there is no evidence that Madden was unresponsive at that time, or that Andrykowski was aware of Madden's condition. Thus, I will grant defendants' summary judgment motion as regards Andrykowski.

12

Case 2:18-cv-00758-LA   Filed 12/30/21   Page 12 of 18   Document 108

## C. Monell Claims

A municipal entity can be liable under § 1983 only when there is a constitutional violation and the violation is a result of the entity's (1) express policy; (2) widespread custom or practice; or (3) a decision by an agent of the entity who has "final policy making authority." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009). As a contractor that provides essential services to state detainees, Armor may also be liable. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014). Plaintiff points to a number of customs or practices which may have contributed to the failure to diagnose Madden's infective endocarditis. Plaintiff's problem is that he does not identify an underlying constitutional violation. As discussed, plaintiff's claims against Mahaga, Adriano, and Andrykowski fail, and plaintiff does not present any other claim of deliberate indifference. Overall, defendants did not ignore Madden's medical needs, medical personal saw him multiple times. Plaintiff points to the October 25 sick call slip that Madden submitted to which defendants did not respond, but that slip requested only antihistamines to alleviate allergy symptoms. It is entirely speculative to suggest that responding to that request would have led to a diagnosis of Madden's infection. Thus, because plaintiff does not show that the care he received was constitutionally inadequate plaintiff's Monell claims against Milwaukee County and Armor fail.

## D. Supervisory Liability Claims

Plaintiff also brings supervisory liability claims against David Clarke, Richard Schmidt, and Nancy Evans. However, plaintiff's claims of supervisory liability fail for the same reason as the Monell claims; plaintiff does not establish an underlying constitutional violation.

13

### E. Excessive Force Claims Against Piasecki[5]

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain on prisoners." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (internal quotations omitted). The "central question" when evaluating whether force used against a prisoner is excessive is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). A plaintiff is not required to show a significant injury resulted from the use of force but the claim "cannot be predicated on a *de minimis* use of physical force," "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Outlaw*, 259 F.3d at 837–38 (internal quotations omitted). "[N]ot every 'malevolent touch by a prison guard' gives rise to a federal cause of action, even if the use of force in question may later seem unnecessary in the peace of a judge's chambers." *Id.* at 838 (quoting *Hudson*, 503 U.S. at 9).

Plaintiff argues that Piasecki used excessive force against Madden in three instances. First, plaintiff takes issue with Piasecki screaming and swearing at Madden during a medical emergency. While Piasecki's language and tone were clearly inappropriate, they are not actionable under the Eighth Amendment. *Antoine v. Uchtman*, 275 Fed. App'x. 962, 963 (7th Cir. 2004) ("the Constitution does not compel guards to

---

[5] The parties agree that the Eighth Amendment applies to the excessive force claim.

address prisoners in a civil tone using polite language").[6] Second, plaintiff argues that Piasecki used excessive force when he twice grabbed Madden by the shirt and forced him to sit or stand up. This use of force was, at most, *de minimis* and was not plainly applied for the purpose of causing harm. *See DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020), (officer's "simple act of shoving" plaintiff qualified "as the kind of de minimis use of force that does not constitute cruel and unusual punishment"). Plaintiff also argues that Piasecki used excessive force when he purposefully moved his leg while Madden was leaning against it causing Madden to fall and hit his head on the concrete floor. Defendants dispute whether Piasecki used force pointing out that it is undisputed that Madden fell. They also argue that the use of force, if any, was at most *de minimis*. Finally, defendants argue that plaintiff does not present sufficient evidence to establish that Piasecki intended that Madden fall, much less that he maliciously attempted to inflict harm.

Allowing an inmate to fall does not typically result in an excessive force claim. *See Gillis v. Stoebner*, 90 Fed. App'x 962, 963 (7th Cir. 2004) (a cut suffered by plaintiff as the result of a fall was not "the product of any malicious or sadistic conduct on the part of the defendants"). Here, however, the evidence suggests that Piasecki was aware that Madden was unable to support himself upright; Madden had already fallen or slumped over several times. Given the testimony from nurse Leigh that Piasecki intentionally

---

[6] Verbal harassment can rise to the level of cruel and unusual punishment when it creates a danger of physical harm or inflicts significant psychological harm, *Beal v. Foster*, 803 F.3d 356, 358–59 (7th Cir. 2015), but plaintiff does not argue that was the case here.

15

moved his leg while Madden was leaning against it, a reasonable jury could conclude that Piasecki expected and intended that Madden fall. And given that Piasecki had been swearing at Madden throughout the encounter, a jury could infer that Piasecki caused Madden to fall with the malicious intent to cause harm. Thus, plaintiff presents enough evidence for a jury to find that Piasecki violated Madden's Eighth Amendment right to be free of excessive force.

Defendants alternatively argue that Piasecki is entitled to qualified immunity. In determining whether a defendant is entitled to qualified immunity, courts must "undertake a two-part analysis, asking: (1) whether the facts alleged, '[t]aken in the light most favorable to the party asserting the injury, … show the officer's conduct violated a constitutional right'; and (2) whether the right was clearly established at the time of its alleged violation." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (quoting *Board v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005)). I have already found that, taken in the light most favorable to plaintiff, Piasecki's conduct may have violated a constitutional right. Thus, the question is whether the right was clearly established. Plaintiff bears the burden of proof on this issue. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2001). Plaintiff can show that a right was clearly established by showing: (1) an analogous case establishing the right to be free from the conduct at issue; or (2) that the conduct was "so egregious that no reasonable person could have believed that it would not violate established rights." *Stiedl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (citing *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2011)). Although the plaintiff need not point to a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Doe. v. Vill. of Arlington Heights*, 782 F.3d 911,

915 (7th Cir. 2015). The Supreme Court has instructed lower courts not to define clearly established law at a high level of generality. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The conduct at issue is Piasecki's allegedly deliberate attempt to make Madden fall by moving his leg while Madden was resting against it. Plaintiff does not identify any case governing this case. Instead, she points to cases establishing the general right of an inmate to be free from the use of excessive force when he is not resisting. None of the cases cited by plaintiff involve a defendant who intentionally allowed or caused a plaintiff to fall, and I cannot say that they place the constitutional question of whether such conduct violates the Eighth Amendment beyond debate. Further, plaintiff does not argue that Piasecki's conduct was so egregious that no reasonable person could have believed it would not violate established rights. Thus, Piasecki is entitled to qualified immunity, and I will grant defendants' motion for summary judgment as it regards Piasecki.

### F. State Law Claims

Plaintiff also asserts several state law claims. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all federal law claims. In such circumstances, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. V. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). I see no reason to disregard the presumption and will, therefore, dismiss plaintiff's state law claims without prejudice.

### G. Motion to Compel

Before me also is plaintiff's motion to compel Armor to turn over certain evidence. I will deny this motion as moot.

17

Case 2:18-cv-00758-LA   Filed 12/30/21   Page 17 of 18   Document 108

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the Armor defendants' motion for partial summary judgment at ECF no. 83 is **GRANTED**.

**IT IS FURTHER ORDERED** that the Milwaukee County defendants' motion for summary judgment at ECF no 78 is **GRANTED IN PART** as regards plaintiff's federal law claims and **DENIED IN PART** as regards plaintiff's state law claims.

**IT IS FURTHER ORDERED** that plaintiff's remaining state law claims are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that plaintiff's motion to compel at ECF no. 74 is **DENIED AS MOOT.**

The Clerk of Court is directed to enter judgment.

Dated at Milwaukee, Wisconsin, this 30th day of December, 2021.

> s/Lynn Adelman
> LYNN ADELMAN
> United States District Judge